900 P.2d 1293

**Shigeyuki TACHIBANA, Petitioner–Defendant–Appellee, Cross–Appellant,**

v.

**STATE of Hawai'i, Respondent–Appellant, Cross–Appellee.**

**No. 16589.**

Supreme Court of Hawai'i.

July 26, 1995.

228

Ira Leitel, Kamuela, for petitioner-defendant-appellee/cross-appellant.

Daniel A. Morris and S. Gail Robertson, Deputy Attys. Gen., Honolulu, for respondent-appellant/cross-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

KLEIN, Justice.

In 1987, Petitioner Shigeyuki Tachibana was convicted of Theft in the First Degree. On appeal, the conviction was affirmed by this court. *State v. Tachibana,* 70 Haw. 658, 796 P.2d 1002 (1988) (mem.). In 1990, Tachi-

bana filed a petition for post-conviction relief pursuant to Rule 40 of the Hawai'i Rules of Penal Procedure (HRPP). After a hearing, the third circuit court entered an order on October 5, 1992, granting Tachibana's petition for post-conviction relief and, on October 12, 1992, filed findings of fact (FOF) and conclusions of law (COL) in support of the order. Respondent State of Hawai'i filed a timely appeal from the order and the FOF/COL. Tachibana thereafter filed a cross-appeal. For the reasons set forth below, we affirm.

## I. BACKGROUND

In 1983, Tachibana was the president and sole shareholder of the Hawaii International Sporting Club, Inc. (HISC). On October 17, 1983, Tachibana contracted to sell forty percent of HISC's stock to Artnature Company, Ltd. (Artnature), a Japanese corporation run by Saburo Akutsu. The contract of sale was entered into between Tachibana and Akutsu at a meeting held on the island of Hawai'i.

On May 15, 1985, a civil suit was brought against Tachibana (*Artnature Co., Ltd. v. Shigeyuki Tachibana, et. al.*) alleging that Tachibana had induced Akutsu to purchase the HISC stock by misrepresenting the nature and extent of HISC's holdings with the intent to deceive and defraud Artnature. Wallace Gallup, the attorney who had represented Tachibana in the incorporation of HISC and who had drawn up the Stock Purchase Agreement at issue, initially represented Tachibana in that case.

Then, on March 13, 1986, Tachibana and six other individuals, including Dwight Belt, an HISC employee, were indicted for commission of Theft in the First Degree and Criminal Conspiracy based on the allegedly fraudulent sale. Tachibana retained attorney David Schutter to prepare his defense. Tachibana agreed to pay $250,000 plus costs for Schutter's services. Subsequently, Tachibana, Schutter, and Gallup agreed that Tachibana would be better served in his criminal defense if Schutter were able to take advantage of the liberal rules of discovery in

civil cases, and, therefore, Schutter took over the defense in the *Artnature* case.

In November 1986, the criminal trial of Tachibana and Belt began.[1] The defense team for Tachibana consisted of Schutter, two other attorneys, Stacy Moniz and Jerel Fonseca, a paralegal, Kris Watanabe, and an interpreter, Youko Smith. Belt was represented by attorney Michael Zola.

Smith was part of Tachibana's defense team because, although Tachibana was able to communicate without an interpreter in a limited manner using what was informally known as "Tachibana–English," his English proficiency was poor; Tachibana had a third-grade education in Japan, never studied English, and came to Hawai'i at the age of forty in 1972.

The trial began with the prosecution's opening statement. At that time, Smith was providing Tachibana with simultaneous translation.[2] During the opening statements, the trial court judge noticed that the jurors were being distracted by the volume of the interpretation and noticeably looked in the direction of Smith several times. Schutter then directed Smith to discontinue the simultaneous translation. At the Rule 40 hearing, Tachibana testified that he had asked Schutter to resume the simultaneous translation, but that Schutter had refused, telling him it would give a bad impression to the judge and jury.

The next day, Schutter filed a motion to disqualify the trial court judge because of the prejudicial effect his "glares" at the interpreter had had on the jury, and would continue to have, if simultaneous interpretation were to resume. The trial court denied the motion, trial continued, and Schutter never directed Smith to resume the simultaneous translation. Smith, however, remained at or near the defense table throughout the trial and provided summaries of the witnesses' testimony to Tachibana during lunch breaks and other recesses.

During the recesses, Tachibana frequently expressed his desire to testify. After the prosecution rested, however, the defense team decided as a tactical matter that it would be best not to call Tachibana as a witness. Schutter told Zola that he did not want to call Tachibana as a witness because the cross-examination of Akutsu had been effective and because Tachibana would not be a good witness. Zola had the impression that Schutter was going to talk to Tachibana and convince him not to testify.

When the trial later resumed, Schutter presented one live witness, Thomas Takahara, then read portions of the prior deposition testimony of Hidetake Ijuin, and finally, informed the court that Tachibana rested; Zola did not call any witnesses to testify in Belt's defense. After Schutter rested, he grabbed Tachibana by the shoulder and took him outside the courtroom. Tachibana appeared shocked and frustrated that the trial had ended without his testimony. He continued to insist that he be able tell his side of the story. At the Rule 40 hearing, Tachibana testified that when he told Schutter that he was going to talk to the judge about not being allowed to testify, Schutter told him that "with this judge, it's useless to do anything." Tachibana further testified that Schutter told him that even if the jury returned a guilty verdict, because the trial was full of errors, the conviction would not be upheld on appeal, and he would get a chance to tell his story after the case was remanded. Ultimately, Tachibana did not inform the trial court that he wanted to testify.

The jury thereafter found Tachibana guilty of Theft in the First Degree and acquitted Belt of both charges. Tachibana was sen-

---

1. On July 16, 1986, the indictment in the criminal case had been dismissed as to two of the named defendants, and between 1988 and 1989, the State moved to nolle prosequi the charges against the three remaining defendants.

2. During the opening statements, the prosecuting attorney objected to the presence of Smith in the courtroom because she was listed as a defense witness. The trial court allowed Smith to remain at the defense table because she would not be called to present any substantive evidence.

tenced to five years probation with the special conditions that he pay a fine of $5,000 and that he be jailed for one year.

After Tachibana was convicted and sentenced, Schutter filed an appeal with this court. We affirmed the judgment of the trial court in a memorandum opinion entered on October 26, 1988. *State v. Tachibana*, 70 Haw. 658, 796 P.2d 1002 (1988) (mem.). In the opinion, although the opening briefs were criticized, we addressed the merits of four issues, as follows:

> As nearly as we can understand, appellant makes four contentions. First, he contends that proof of loss on the part of the purchaser was an essential element of the crime charged. It is obvious to us that HRS §§ 708–832 and 708–831(1)(b) do not require proof of loss in the case of the transaction here involved.

> Secondly, appellant contends that there was a settlement agreement in Japan and that therefore the court below lacked jurisdiction. We find no merit in this contention. Thirdly, he claims that there was prosecutorial misconduct in failing to extradite co-defendants, in failing to provide the grand jury with exculpatory evidence, and that there was a fatal variance in the indictment. None of these contentions have any merit. Lastly, he argues that there was error in qualifying certain interpreters. We find no basis in the record for this.

On June 14, 1988, a tentative settlement in the *Artnature* case was reached, whereby Tachibana would pay $700,000 and Artnature would return the HISC stock; by December 8, 1988, the case was dismissed. Meanwhile, on November 3, 1988, Schutter filed suit against Tachibana for payment of fees and expenses from the civil and criminal litigation totalling just over $300,000; Tachibana counterclaimed alleging malpractice. Extensive discovery followed, during which all of the members of the defense team testified that Tachibana had been informed of his right to testify and had agreed to follow Schutter's advice that he refrain from testifying.

While the fee/malpractice litigation was ongoing, on December 5, 1990, Tachibana filed the petition for post-conviction relief at issue in the instant case alleging (1) that Schutter's failure to introduce the Stock Purchase Agreement into evidence, his failure to call Tachibana and several other individuals as witnesses, his "waiver" of Tachibana's right to testify, and his reliance on the "lack of detrimental reliance" defense amounted to ineffective assistance of counsel at trial, and (2) that Schutter's failure to raise all relevant issues on appeal and his failure to comply with the Hawai'i Rules of Appellate Procedure in the appellate briefs constituted ineffective assistance of counsel on appeal.

Then, on April 8, 1991, Schutter signed an affidavit that virtually admitted that he had provided ineffective assistance at trial; Moniz had signed a similar affidavit on April 4, 1991. The next day, the parties settled the fee/malpractice suit—Tachibana agreed to pay the $300,000 and drop the malpractice counterclaim, while Schutter agreed to provide a truthful affidavit or testimony at the Rule 40 proceedings. Aside from signing the affidavit, Schutter apparently gave up nothing.

After obtaining the affidavits from Schutter and Moniz, Tachibana filed an amended petition for post-conviction relief that expanded on the original claims and additionally alleged that Schutter failed to seek or insure interpretation of the court proceedings, failed to explain to Tachibana his right to simultaneous translation and discontinued it without Tachibana's consent, failed to adequately prepare for the defense, and failed to object to certain excludable evidence at trial.

A hearing on the motion for post-conviction relief was held in March 1992. On July 20, 1992, the circuit court sent a letter announcing its decision to grant Tachibana's petition on the ground that Schutter prevented Tachibana from testifying in his own behalf in violation of Tachibana's constitutional right to testify; all other grounds urged in the petition were denied. On October 5, 1992, the order granting post-conviction re-

lief was filed, and on October 12, 1992, the FOF/COL in support of the order were filed.

On November 2, 1992, the State filed a notice of appeal. In its appeal, the State argues that the circuit court erred in concluding that Tachibana's right to testify was violated. On November 13, 1992, Tachibana filed a notice of cross-appeal. In his cross-appeal, Tachibana argues that the court erred in concluding that his right to simultaneous translation was not violated; the cross-appeal does not challenge the court's rejection of any of the other grounds urged in the Rule 40 petition.

## II. *STANDARD OF REVIEW*

 When a petition for post-conviction relief "is not dismissed as patently frivolous, .HRPP Rule 40(g) requires the circuit court to state its findings of fact and conclusions of law in entering its judgment on the petition." *Domingo v. State,* 76 Hawai'i 237, 243, 873 P.2d 775, 781 (1994) (quotations marks omitted). The FOF made by a court in this context

> are reviewed under the clearly erroneous standard. A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed. An appellate court may freely review conclusions of law and the applicable standard of review is the right/wrong test.

*Dan v. State,* 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994) (citations and quotation marks omitted).

## III. *DISCUSSION*

### A. *Right to Testify*

Although the Rule 40 petition was nominally based only on alleged ineffective assistance of counsel, the arguments regarding Tachiba-

na's failure to testify raise two distinct issues: (1) whether Schutter's decision not to present Tachibana as a witness amounted to ineffective assistance of counsel; and (2) whether Tachibana's constitutional right to testify was violated at trial by the acts of his defense counsel. *See LaVigne v. State,* 812 P.2d 217, 220 (Alaska 1991) (treating claim that counsel usurped defendant's right to testify as independent constitutional claim although raised as part of claimed ineffective assistance of counsel). This section will address Tachibana's right to testify on his own behalf.[3]

> [A d]efendant's right to testify in his [or her] own defense is guaranteed by the constitutions of the United States and Hawai'i and by a Hawai'i statute.

> The right to testify in one's own behalf arises independently from three separate amendments to the United States Constitution. It is one of the rights guaranteed by the due process clause of the fourteenth amendment as essential to due process of law in a fair adversary process....

> The right to testify is also guaranteed to state defendants by the compulsory process clause of the sixth amendment as applied through the fourteenth amendment....

> Lastly, the opportunity to testify is also a necessary corollary to the Fifth Amendment's guarantee against compelled testimony, since every criminal defendant is privileged to testify in his [or her] own defense, or to refuse to do so.

> Because the texts of sections 5, 14, and 10 of article I of the Hawai'i Constitution parallel the fourteenth, fifth, and sixth amendments to the United States Constitution, ... the right to testify is also guaranteed by these parallel provisions of the Hawai'i Constitution....

> [T]here is [also a] statutory protection for the right to testify. HRS § 801–2 (1985) states:

3. Because we affirm the circuit court's ruling that Tachibana's right to testify was violated, we need not reach the issue whether Schutter's tacti-

cal decision not to call Tachibana as a witness amounted to ineffective assistance of counsel.

In the trial of any person on the charge of any offense, he [or she] shall have a right ... to be heard in his [or her] defense.

*State v. Silva*, 78 Hawai'i 115, 122–23, 890 P.2d 702, 709–10 (App.1995) (citations, quotation marks, footnote, and emphases omitted).

Tachibana does not claim that the trial court or the prosecution prevented him from testifying in his own behalf, but contends that he never waived his right to testify and that his own attorney unilaterally usurped his right to testify.

 "The decision to testify is ultimately committed to a defendant's own discretion[.]" *Silva*, 78 Hawai'i at 124, 890 P.2d at 711. *See also United States v. Moody*, 977 F.2d 1425, 1430 (11th Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 1948, 123 L.Ed.2d 653 (1993) (citing *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 3312–13, 77 L.Ed.2d 987 (1983); *American Bar Assoc. Standards Relating to the Admin. of Criminal Justice*, Compilation p. 127 (1974)); *Wainwright v. Sykes*, 433 U.S. 72, 93 n. 1, 97 S.Ct. 2497, 2509–10, 53 L.Ed.2d 594 (Burger, J., concurring) ("Only such basic decisions as whether to plead guilty, waive a jury or testify in one's own behalf are ultimately for the accused to make"), *reh'g denied*, 434 U.S. 880, 98 S.Ct. 241, 54 L.Ed.2d 163 (1977). Thus, "a defendant's personal constitutional right to testify truthfully in his [or her] own behalf may not be waived by counsel as a matter of trial strategy," *Moody*, 977 F.2d at 1431 (quoting *United States v. Curtis*, 742 F.2d 1070, 1076 (7th Cir.1984), *cert. denied*, 475 U.S. 1064, 106 S.Ct. 1374, 89 L.Ed.2d 600 (1986)), but " 'may be relinquished only by the defendant.' " *Silva*, 78 Hawai'i at 123, 890 P.2d at 710 (quoting *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir.), *cert. denied*, — U.S. ——, 114 S.Ct. 620, 126 L.Ed.2d 584 (1993)).

The State does not challenge any of these propositions of law. The State, however, raises a number of arguments in support of its position that, based on the facts of this case, the circuit court erred in granting Tachibana's petition for post-conviction relief.

### 1. *HRPP Rule 40(a)(3) Waiver*

The State first argues that the issue whether Tachibana's right to testify was violated was waived because it was not previously raised on appeal. HRPP Rule 40(a)(3) provides in pertinent part that:

[a]n issue is waived if the petitioner knowingly and understandingly failed to raise it and it could have been raised before the trial, at the trial, on appeal, in a habeas corpus proceeding or any other proceeding actually conducted, or in a prior proceeding actually initiated under this rule and the petitioner is unable to prove the existence of extraordinary circumstances to justify his [or her] failure to raise the issue.

 The claim that Tachibana's right to testify was violated by the unilateral action of his attorney is similar to a claim of ineffective assistance of counsel. In both cases, in order for the issue to be raised, errors or misdeeds by defense counsel would have to be brought to the attention of the reviewing court. With respect to claims of ineffective assistance, we have held that "[w]here petitioner has been represented by the same counsel both at trial and on direct appeal, no waiver of the issue of trial counsel's performance occurs because no realistic opportunity existed to raise the issue on direct appeal." *Briones v. State*, 74 Haw. 442, 459, 848 P.2d 966, 975 (1993). Similarly, where trial and appellate counsel are the same, no realistic opportunity exists for a defendant to raise the issue whether that attorney usurped his or her right to testify. In the instant case, Schutter represented Tachibana both at trial and on direct appeal. Therefore, there was no Rule 40 waiver of the issue whether Schutter usurped Tachibana's right to testify.

### 2. *Public Policy*

The State further contends that "to allow Tachibana another trial would truly be an

absurdity" and that "justice and public policy ... demand a responsible and reasonable system which does not allow a defendant to sandbag [the criminal justice] system and turn it into an absurdity." We agree that it is important to adopt a system of protecting each defendant's personal right to testify while maintaining the integrity of the criminal justice system, and we endeavor to do so.

In *Boyd v. United States*, 586 A.2d 670 (D.C.App.1991), the court presented a thorough discussion of the three primary approaches that courts throughout the country have taken when defendants have claimed that their attorneys deprived them of their right to testify. One approach would require the trial court to engage in an on-the-record colloquy with every defendant to ensure that any waiver of the defendant's right to testify is knowing and voluntary:

> There are well-documented benefits to the colloquy procedure. Since the rights at issue are fundamental to a fair trial, the courts have a "serious and weighty responsibility [to] determine[ ] whether there is an intelligent and competent waiver by the accused." *Johnson v. Zerbst*, [304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) ]. In addition, advisement by the court on the record "preclude[s] postconviction disputes between defendant and counsel over the issue, and facilitate[s] appellate review." [*People v.*] *Curtis*, [681 P.2d 504, 515 (Colo.1984) ]. In the situation involving complaints about trial counsel's preparation, moreover, the trial judge can address concerns at a time when problems can be rectified before the community's resources are expended on a trial.

Many of the courts to consider the problem of post-trial challenges based on denial of the right to testify have adopted the "colloquy" method: the trial judge must engage in an on-the-record discussion with the defendant to ensure that she [or he] has knowingly waived her [or his] right to testify. Under this approach, if the defense rests without calling the defendant, the trial judge, as a matter of routine, conducts an inquiry outside the jury's presence into the circumstances of the waiver.

The colloquy approach for the right to testify has not, however, gone unchallenged. The objections have led a second group of courts to adopt the "demand" rule ...: a defendant who fails to complain about the right to testify during trial is conclusively presumed to have waived that right. Courts using the demand rule will not entertain a post-trial challenge based on the right to testify. The demand rule is justified in two different ways. Either the right to testify is not viewed by these courts as fundamental, or they presume that a defendant, "[e]ducated by television and past courtroom experience," has knowledge of the right to testify." [*United States v.*] *Martinez*, [883 F.2d 750, 761 (9th Cir.1989), *vacated on other grounds*, 928 F.2d 1470 (9th Cir.), *cert. denied*, 501 U.S. 1249, 111 S.Ct. 2886, 115 L.Ed.2d 1052 (1991) ].

A third group of courts has crafted a compromise between the two previous methods, the "post-trial challenge" approach: a trial judge need not *sua sponte* question the defendant during the trial, but the defendant is free to bring a post-conviction challenge based on a denial of the right to testify. To prevail in such a challenge, the defendant must demonstrate that he or she did not knowingly waive the right to testify at trial. The post-trial challenge approach is defended as less burdensome on trial judges, who would not be required routinely to advise a silent defendant of the right to testify, and as avoiding inappropriate judicial influence on the defendant.

586 A.2d at 675–677 (citations and footnotes omitted).

Relying primarily upon *Martinez, supra,* the State urges us to adopt the demand rule. We decline to do so. In this context, we agree with the *Boyd* court's conclusion that

> the "demand rule" advocated by the government is fatally flawed. The demand rule ignores basic realities faced by the

defendant and the courts. Many defendants are unaware that they have a constitutional right to testify which no one, not even their lawyer, may take away from them. In addition, the demand rule requires the defendant to ignore the admonishments of counsel, interrupt the trial proceedings, and interject herself, uninvited, into the fray. Such a rule ignores the courtroom reality that defendants who speak out of turn at their own trials are quickly reprimanded and sometimes banned from the courtroom by the court.... To the extent a defendant may have been "educated by television" to realize that he or she has such a right, as one opinion, on which the government relies, suggested, *see Martinez, supra* ..., the defendant still may not know that an objection must be made during trial or that right is forever lost. Further, in *Johnson v. Zerbst* the Court was unwilling to "presume acquiescence in the loss of fundamental rights." 304 U.S. at 464, 58 S.Ct. at 1023. In sum, the demand rule requires a defendant to assert a right of which the defendant may not be aware by objecting in a manner the defendant has been told is inappropriate. We decline to adopt a rule which places such burdens on the exercise of a fundamental constitutional right.

*Boyd,* 586 A.2d at 677 (citations and quotation marks omitted). *See also Martinez,* 883 F.2d at 766–67 (Reinhardt, J., dissenting).

Of the remaining two approaches—the colloquy approach and the post-conviction challenge approach—we believe the colloquy approach will best protect defendants' rights while maintaining the integrity of the criminal justice system. We agree with the Alaska Court of Appeals' observation that "if the

[trial] court does not establish on the record that the defendant has waived his [or her] right to testify, it is extremely difficult to determine at a post-conviction relief hearing whether such a waiver occurred." *LaVigne v. State,* 788 P.2d 52, 55 (Alaska Ct.App. 1990), *rev'd on other grounds,* 812 P.2d 217 (Alaska 1991).[4] *See also People v. Curtis,* 681 P.2d at 516 (noting that post-trial hearings to determine facts underlying claimed deprivation of right to testify "not only increases the chance of error, but is wasteful of judicial resources as well"); *Gill v. State,* 632 So.2d 660, 661 n. 1, 662–63 (Fla.Dist.Ct.App. 1994) (although "reject[ing] any suggestion [that] a conviction should be reversed on direct appeal every time the record contains no colloquy about defendant's desire to testify," noting that "the plain fact remains that the interests of both the defendant and the state may be served better by addressing the issue up front rather than years later in some postconviction proceeding").

The instant case is testament to the proposition that determining whether a particular defendant actually waived his or her right to testify based on evidence presented in a post-conviction proceeding can be an almost impossible task. The circuit court was required to wade through the voluminous trial record, numerous depositions procured during the related civil litigation, and five days of testimony at the Rule 40 hearing, and even after the circuit court found that Tachibana's attorney had usurped his right to testify, the State challenged the court's findings as clearly erroneous.

We further observe that

[t]he disadvantages of the colloquy requirement appear to be overstated. Al-

---

4. In reversing the decision of the Alaska Court of Appeals (for applying the improper standard of review in determining whether the denial of the defendant's right to testify required that his conviction be vacated), the Alaska Supreme Court made the following pronouncement:

> To avoid future cases such as LaVigne's, we believe that trial judges should take steps to insure that a criminal defendant's failure to take the stand in his or her own defense was the result of a knowing and voluntary decision

made by the defendant. To accomplish this, we believe judges should make an on-the-record inquiry after the close of the defendant's case, although out of the jury's hearing, into whether a nontestifying defendant understands and voluntarily waives his [or her] right. Such action insures a valid waiver of the defendant's right. It will also assist in any subsequent appellate review of a defendant's claim to the contrary.

*LaVigne,* 812 P.2d at 222.

though trial judges would be required to advise defendants who do not testify, the burden would be relatively minimal. Indeed, by engaging in the colloquy, a trial judge would establish a record that would effectively settle the right-to-testify issues in the case, and thereby relieve the trial judge of extended post-conviction proceedings. If the trial court does not establish on the record that the defendant understands and knowingly waives his [or her] right to testify, it is difficult to establish at the post-conviction relief hearing whether such a waiver occurred. Thus, many defendants would be able to raise colorable claims that their right to testify had been violated. Hence, as a practical matter, courts would be forced to inform defendants of the right to testify so as to avoid a post-hoc invalidation of the entire trial. Thus, the administrative burden of the colloquy requirement on the trial judge, as well as the appellate court, would in all likelihood be much less than the burden under the post-trial challenge method. In sum, the colloquy procedure would best serve all of the interests of all parties in the administration of justice.

*Boyd*, 586 A.2d at 679–80 (citations, quotation marks, and footnotes omitted).

We recognize that there are risks involved in requiring trial courts to conduct colloquies regarding the defendant's right to testify. For example, "by advising the defendant of his [or her] right *to* testify, the court could influence the defendant to waive his [or her] right *not to* testify, thus threatening the exercise of this other, converse, constitutionally explicit and more fragile right." *Martinez*, 883 F.2d at 760 (citation and quotation marks omitted; emphases in original); *see also*

*Moody*, 977 F.2d at 1431 ("A trial judge should take care that he [or she] not intentionally sway the defendant in making this fundamental choice."). In addition, "so advising a defendant might improperly intrude on the attorney-client relation, protected by the Sixth Amendment." *Martinez*, 883 F.2d at 760; *see also Silva*, *supra*.[5]

These risks, however, do not convince us that colloquies regarding the right to testify should not be required. First, although

> requiring the trial court to inform the defendant of his [or her] constitutional right may indeed have a marginal effect on the number of times the Fifth Amendment privilege is exercised, [we] do not think this is a particular cause for concern. An adequate inquiry would remind the defendant that he [or she] has the constitutional right to remain silent, and … basic values of personal dignity and fairness are enhanced when the defendant is presented with an opportunity to choose among relevant alternatives. Consequently, [we] do not believe that an in-court discussion attended by counsel where the judge identifies the choices available to the defendant is a threat to free exercise of the privilege against compelled self-incrimination.

*Martinez*, 883 F.2d at 766–67 (Reinhardt, J., dissenting) (footnote omitted); *accord Boyd*, 586 A.2d at 679 n. 19 ("[W]ith appropriate instructions, the defendant can be advised of both the right to testify and the right not to testify, without influencing the decision one way or the other.").

Moreover, the trial courts in this state are already required to engage in on-the-record colloquies with criminal defendants when the waiver of other fundamental rights are at

**5.** In *Silva*, the Intermediate Court of Appeals (ICA) stated that the "[d]efendant was entitled to make the final personal determination of whether or not to [testify] in consultation with counsel, without the intervention of the court, whatsoever." *Silva*, 78 Hawai'i at 125, 890 P.2d at 712. The ICA did, however, recognize that there may be some cases in which the trial court would be "obligated to examine a defendant's exercise of the right [to testify.]" *Id.* at 124, 890 P.2d at 711.

To the extent that the ICA suggested that such an obligation arises only in "the atypical case," *id.*, we disagree for the reasons stated in the text. On the other hand, we agree with the ICA's holding that when a court does advise a defendant regarding the right to testify, "its role is limited to making sure that the defendant understands his or her rights and ensuring that the defendant's final decision is made voluntarily, with no coercion or undue influence." *Id.* (citation and quotation marks omitted).

issue. *See, e.g., State v. Kupau,* 76 Hawai'i 387, 395–96 n. 13, 879 P.2d 492, 500–01 n. 13 (1994) (right to included offense instructions); *State v. Ibuos,* 75 Haw. 118, 121, 857 P.2d 576, 578 (1993) (right to trial by jury); *State v. Vares,* 71 Haw. 617, 622–23, 801 P.2d 555, 558 (1990) (right to counsel); *Conner v. State,* 9 Haw.App. 122, 126, 826 P.2d 440, 442–43 (1992) (right to have guilt proved beyond a reasonable doubt (i.e., entry of guilty plea)). The trial courts are able to conduct these colloquies without improperly intruding on the right to counsel, and there does not appear to be any reason why colloquies regarding the right to testify should be any different. *See Boyd,* 586 A.2d at 679 n. 19 (recognizing that "other trial court waiver inquiries have not been viewed as creating appreciable problems" and noting that "[n]o basis has been put forward to suspect any greater intrusion with an inquiry into the waiver of the right to testify"); *Martinez,* 883 F.2d at 767 (Reinhardt, J., dissenting) ("[T]rial court waiver inquiries . . . have never created a problem with respect to the right to counsel, plea bargaining, jury trial or any of the other fundamental and personal rights protected under *Johnson v. Zerbst.*").

▮ Thus, we hold that in order to protect the right to testify under the Hawai'i Constitution,[6] trial courts must advise criminal defendants of their right to testify and must obtain an on-the-record waiver of that right in every case in which the defendant does not testify.[7] Although the majority of jurisdictions have declined to adopt a colloquy re-

quirement, *see generally* Annotation, *Necessity That Waiver of Accused's Right to Testify in Own Behalf Be on the Record,* 90 A.L.R.4th 586 (1991 & Supp.1994), we are by no means the first to do so. *See Hurn v. State,* 872 P.2d 189, 198 (Alaska App.1994) (recognizing holding of *LaVigne, supra,*[8] that "whenever a criminal defendant does not take the stand at trial, the trial judge is under a duty to inquire, before the defense case closes, whether the defendant knows that the decision to testify or not rests with him or her, and to ascertain that the defendant has personally chosen not to testify"); *Sanchez v. State,* 841 P.2d 85, 89 (Wyo.1992) (adopting holding of *LaVigne, supra* ); *State v. Neuman,* 179 W.Va. 580, 584, 371 S.E.2d 77, 81 (1988) (holding that "procedural safeguards must be employed on the record to insure that the defendant's waiver of the right to testify was made voluntarily, knowingly, and intelligently"); *People v. Curtis,* 681 P.2d at 515 (holding that "waiver of the right to testify must be voluntary, knowing and intentional, and the existence of effective waiver should be ascertained by the trial court on the record"); *see also Boyd,* 586 A.2d at 678–80 (suggesting, without deciding, that colloquy is required); *Culberson v. State,* 412 So.2d 1184, 1186–87 (Miss.1982) (same).

We now turn to the question of when the trial court should conduct the colloquy regarding the right to testify. Some of the cases have suggested that a defendant's waiver of the right to testify may be obtained after the defense rests. *See, e.g., LaVigne,*

---

6. Although no decision of the United States Supreme Court directly addresses the issue, the United States Constitution apparently allows a waiver of the right to testify by virtue of an uninformed defendant's failure to notify the trial court of his desire to testify. *See Martinez, supra; United States v. Edwards,* 897 F.2d 445, 447 (9th Cir.) (holding that "Edwards'[s] silence at trial effectively waived his right to testify on his own behalf"), *cert. denied,* 498 U.S. 1000, 111 S.Ct. 560, 112 L.Ed.2d 567 (1990); *Siciliano v. Vose,* 834 F.2d 29 (1st Cir.1987).

7. In conducting the colloquy, the trial court must be careful not to influence the defendant's decision whether or not to testify and should limit the colloquy to advising the defendant

that he [or she] has a right to testify, that if he [or she] wants to testify that no one can prevent him [or her] from doing so, [and] that if he [or she] testifies the prosecution will be allowed to cross-examine him [or her]. In connection with the privilege against self-incrimination, the defendant should also be advised that he [or she] has a right not to testify and that if he [or she] does not testify then the jury can be instructed about that right.

*State v. Neuman,* 179 W.Va. 580, 585, 371 S.E.2d 77, 82 (1988) (quoting *People v. Curtis,* 681 P.2d at 514).

8. *See supra* note 4.

812 P.2d at 222 (suggesting colloquy "after the close of the defendant's case"); *Sanchez*, 841 P.2d at 89 (adopting holding of *La-Vigne*); *Culberson*, 412 So.2d at 1186 (suggesting only that colloquy occur "before the case is submitted to the jury"); *see also Martinez*, 883 F.2d at 767 (Reinhardt, J., dissenting) ("the moment when the defense rests is a perfectly appropriate—as well as administratively convenient—time to conduct the colloquy"); *cf. Boyd*, 586 A.2d at 676, 678 (at one point implying that colloquy method only requires colloquy after the defense rests, and at another point suggesting that trial courts should conduct colloquy before the defendant rests). Other cases have suggested that it would be best to advise defendants of their right to testify "before trial," *Commonwealth v. Waters*, 399 Mass. 708, 717 n. 3, 506 N.E.2d 859, 865 n. 3, *reh'g denied*, 400 Mass. 1006, 511 N.E.2d 356 (1987), "at or near the end of the State's case-in-chief," *Phillips v. State*, 105 Nev. 631, 633, 782 P.2d 381, 382 (1989), or "immediately prior to the close of the defense's case." *Torres-Arbole-do v. State*, 524 So.2d 403, 411 n. 2 (Fla.), *cert. denied*, 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988); *see also Hurn*, 872 P.2d at 198 (interpreting *LaVigne* as requiring colloquy "before the defense case closes").

 We believe that, in jury trials, there is some potential for prejudice to the defendant if the colloquy regarding the right to testify is not conducted until after the defense rests—if the defendant asserts his or her right to testify at that point, the jury might view the defendant's testimony with suspicion because of the fact that it is given after the defense has already rested and in apparent contravention of the defendant's attorney's wishes. On the other hand, the

defendant may not be in a position to decide whether to waive the right to testify until all other evidence has been presented. Accordingly, the ideal time to conduct the colloquy is immediately prior to the close of the defendant's case. Therefore, whenever possible, the trial court should conduct the colloquy at that time.[9]

 If the trial court is unable to conduct the colloquy at that time, however, such failure will not necessarily constitute reversible error. If a colloquy is thereafter conducted and the defendant's waiver of his or her right to testify appears on the record, such waiver will be deemed valid unless the defendant can prove otherwise by a preponderance of the evidence. *See Ibuos*, 75 Haw. at 121, 857 P.2d at 578 ("[W]here it appears from the record that a defendant has waived a constitutional right, the defendant carries the burden of proof to show otherwise by a preponderance of the evidence."). Similarly, if a defendant asserts his or her right to testify during a colloquy conducted after the defense has rested and the trial is reopened to allow the defendant to testify, the defendant's right to testify will be considered satisfied unless the defendant can demonstrate that he or she was actually prejudiced by the fact that the testimony was given after the defense had already rested.

In the instant case, the trial court did not at any time conduct a colloquy with Tachibana to ensure that he was aware of his right to testify and that he knowingly and voluntarily waived that right. If our holding in this case were to apply retrospectively, we would be compelled to affirm the circuit court's conclusion that Tachibana's right to testify was violated based solely on the lack of such a

9. Of course, the trial court judge cannot independently foresee when the defense is on the verge of resting and conduct the colloquy at that precise moment. Consequently, the trial courts will require the cooperation of defense counsel to enable them to conduct the colloquy immediately prior to the close of the defendant's case.

Furthermore, although the ultimate colloquy should be conducted after all evidence other than the defendant's testimony has been received, it would behoove the trial court, prior to the start

of trial, to (1) inform the defendant of his or her personal right to testify or not to testify and (2) alert the defendant that, if he or she has not testified by the end of the trial, the court will briefly question him or her to ensure that the decision not to testify is the defendant's own decision. Such an early warning would reduce the possibility that the trial court's colloquy could have any inadvertent effect on either the defendant's right not to testify or the attorney-client relationship.

colloquy. We must therefore decide whether or not to give our holding retrospective application.

In *Hurn, supra,* the Alaska Court of Appeals declined to apply the colloquy requirement established in *LaVigne, supra,* retrospectively to cases that were tried prior to that decision. The court explained its reasons for prospective application of the colloquy requirement as follows:

> The rule announced in *LaVigne* was a new rule of practice, designed to forestall post-trial litigation by requiring the trial judge to make an on-record memorial of a decision that is normally made in private discussions between attorney and client. A failure to comply with the *LaVigne* rule is harmful, not because that failure by itself proves that a defendant's constitutional right was abridged, but because the failure makes it harder to determine the facts underlying the defendant's claim of constitutional violation. As the Supreme Court of Colorado stated in *People v. Curtis,* 681 P.2d 504 (Colo.1984), when it rejected retroactive application of its own on-the-record inquiry rule:

>> While a primary purpose of placing the ... waiver on the record is to improve the accuracy of verdicts, a silent record in a trial [held] before our decision today does not in and of itself raise serious doubts about the accuracy of the guilty verdict.... [W]e believe it likely that retroactive application would be a significant burden on the administration of justice.

*People v. Curtis,* 681 P.2d at 517.

*Hurn,* 872 P.2d at 198–99. *See also Curtis,* 681 P.2d at 517 (refusing to give retroactive effect to its holding that waiver of the right to testify must be on the record to be effective); *Hunter v. United States,* 588 A.2d 680 (D.C.App.) (stating that "if our expression in *Boyd* [, *supra* ] had been a holding, we conclude that it would not have had retroactive effect"), *cert. denied,* 502 U.S. 892, 112 S.Ct. 256, 116 L.Ed.2d 210 (1991); *Neuman,* 179 W.Va. at 585, 371 S.E.2d at 82 (holding that "the specific requirements of these procedural safeguards shall be applied prospectively in cases other than the one before us").

■ We agree with the foregoing cases and expressly hold that the colloquy requirement established in this case shall only apply prospectively to cases in which trial is not completed until after the date of this decision.[10] In all other cases, as suggested in *Cacatian v. State,* 70 Haw. 402, 772 P.2d 691 (1989), post-conviction evidentiary hearings will be required to resolve claims that a defendant's right to testify was usurped by his or her attorney.[11]

### 3. *Post–Conviction Challenge*

In the instant case, the circuit court held an evidentiary hearing to resolve Tachibana's claims. Based on the evidence presented at the Rule 40 evidentiary hearing, the circuit court found that Tachibana "had been advised by his attorneys of his right to testify on his own behalf[, and] ... wanted to testify," and that his attorney "rested [Tachibana's] case without calling [Tachibana] as a

---

**10.** Because we are not applying the colloquy requirement to the instant case or any other case in which trial has been completed, our refusal to apply the colloquy requirement retroactively is not inconsistent with the reasoning of *Powell v. Nevada,* — U.S. —, —, 114 S.Ct. 1280, 1283, 128 L.Ed.2d 1 (1994), and *Griffith v. Kentucky,* 479 U.S. 314, 322–28, 107 S.Ct. 708, 712–16, 93 L.Ed.2d 649 (1987) (stating that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final"). *See State v. Kekona,* 77 Hawai'i 403, 411 n. 3, 886 P.2d 740, 748 n. 3 (1994) (Levinson, J., concurring and dissenting) (explaining why prospective application of new rule, without applica-

tion to the defendant in the case pronouncing the prospective rule, "would not violate the reasoning of *Powell* and *Griffith* because there would be no 'selective application' of the rule to 'similarly situated defendants.' ").

**11.** In *Cacatian,* we reversed the circuit court's dismissal without a hearing of Cacatian's Rule 40 petition, which included a claim that his counsel had prevented him from testifying. We suggested that the merits of such a claim could "only be determined at a hearing." 70 Haw. at 404, 772 P.2d at 692.

witness." The court concluded that "defense counsel's decision to rest [Tachibana's] case without presenting [Tachibana] as a witness, which was contrary to the wishes of [Tachibana], violated [Tachibana's] right to testify in his trial."

 With respect to the findings of fact, there was plainly substantial evidence to support them. The State, however, argues that the circuit court did not properly consider all of the evidence before it, and that the FOF/COL were clearly erroneous. The State points to the following language from the court's FOF/COL:

> The determination of the facts in this case was made difficult by the conflicting record and credibility problems caused by the civil litigation (initiated by the Defendant's trial counsels against the Defendant for unpaid attorneys fees and costs in the criminal trial and in the concurrent civil case by the complaining witness in the criminal case, Saburo Akutsu, against the Defendant; the Defendant Tachibana answered the complaint and counterclaimed for malpractice in the criminal and civil cases), and the resulting settlement between the Defendant and his trial counsels that resulted in several trial counsels filing affidavits in this proceeding that were now supportive of much of the Defendant's Rule 40 claims. *The Court has substantially disregarded the conflicting evidence that were submitted by the parties to the above settlement, except for those portions that were substantiated in this hearing by other credible witnesses such as Mr. Michael Zola.*

The State argues that the circuit court abdicated its fact-finding duties when it "disregarded" essentially all of the evidence which was not given live at the Rule 40 hearing.

 Upon review of the record, it is apparent that the circuit court properly performed its fact-finding function. The court's initial "decision" on which the order and the FOF/COL were based stated:

> The Court *gave little weight* to those who participated in the $300,000 settlement in

the fee/malpractice case inasmuch as part of the consideration for the settlement was the filing of the affidavits that significantly altered the affiants' position on the ineffective assistance of counsel issues from their pre-settlement adversarial deposition and affidavit testimony. The Court *found the testimony of Michael Zola credible* on the issue of whether the Petitioner wanted to testify in his trial and whether his defense counsel rested without the testimony of the Petitioner.

(*Emphases* added.) This indicates that the circuit court properly performed its fact-finding function of determining the weight and credibility of the evidence presented. Furthermore, there are indications throughout the record that the court was diligently reviewing the record of the criminal trial and the depositions from the civil case. Therefore, the circuit court did not improperly abdicate its fact-finding duties.

 Furthermore, "it is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence[.]" *Domingo,* 76 Hawai'i at 242, 873 P.2d at 780 (citation and quotation marks omitted). In the instant case, there was no definitive evidence that Tachibana knowingly and voluntarily waived his right to testify. To the contrary, there was conflicting evidence presented on that issue at the Rule 40 hearing. On this record, we cannot say that the circuit court's FOF that Schutter usurped Tachibana's right to testify was clearly erroneous.

The State further argues, however, that even if Tachibana's right to testify was violated, he failed to prove that he was thereby deprived of the opportunity to present a meritorious defense. The State apparently makes this argument because Tachibana raised the right to testify issue as part of his ineffective assistance of counsel claim. *See State v. Reed,* 77 Hawai'i 72, 83, 881 P.2d 1218, 1229 (1994) (in order to establish ineffective assistance of counsel, defendant must demonstrate "the withdrawal or substantial impairment of a potentially meritorious de-

fense"). However, because we are not addressing the issue as an ineffective assistance claim but as an independent constitutional claim, *see supra,* Tachibana is not required to prove that he was deprived of a meritorious defense.

Once a violation of the constitutional right to testify is established, the conviction must be vacated unless the State can prove that the violation was harmless beyond a reasonable doubt. *Silva,* 78 Hawai'i at 125, 890 P.2d at 712 ("The harmless beyond a reasonable doubt rule would apply to constitutional error involving the right to testify[.]"); *see also LaVigne,* 812 P.2d at 221 (holding that once defendant establishes that counsel prevented him from testifying and that he would have offered relevant testimony, reversal is required unless State can show that the failure to testify was harmless beyond a reasonable doubt). From our review of the record, "[i]t is impossible to conclude, beyond a reasonable doubt, that [Tachibana]'s testimony could not have created a reasonable doubt in the mind of the factfinder and, hence, that the error could not have contributed to the conviction." *Silva,* 78 Hawai'i at 126, 890 P.2d at 713. Therefore, the violation of Tachibana's right to testify was not harmless beyond a reasonable doubt.

### B. *Right to Adequate Interpretation*

Because we are affirming the circuit court's granting of Tachibana's Rule 40 petition on the ground that his right to testify was violated, we need not address the issue whether Tachibana's right to adequate interpretation was also violated.

### IV. *CONCLUSION*

For the foregoing reasons, we affirm the circuit court's order granting Tachibana's petition for post-conviction relief.

NAKAYAMA, Justice, concurring and dissenting.

I concur in the majority opinion except as to part III.A.2. Because I believe that requiring the trial court to engage in an on-the-record colloquy with every defendant is unnecessary and may inappropriately influence a defendant's decision to testify, I respectfully dissent from part III.A.2.

The right to testify, as the majority correctly points out, is statutorily and constitutionally guaranteed, and is essential to due process of law. However, it is merely one of the many rights granted by statute or by state and federal constitutional provisions. The trial courts in this jurisdiction, of course, are not required to conduct colloquies to ensure that every defendant is made aware of, or has waived, each and every right granted by constitution or state statute. A trial court can justifiably presume, based on a defendant's conduct or silence, that a defendant is aware of and has waived certain rights. This is because the duty to inform a defendant of the existence of certain constitutional rights rationally and justifiably rests with defendant's counsel. *See State v. Silva,* 78 Hawai'i 115, 890 P.2d 702 (App.1995) ("One of defense counsel's responsibilities is to advise the defendant on the question of whether or not he or she should testify.") (citation omitted); *State v. Savage,* 120 N.J. 594, 577 A.2d 455 (1990) (placing the responsibility for informing a defendant of the right to testify on defendant's counsel). Indeed, trial courts are not required, for example, to conduct a colloquy to ensure that every defendant represented by counsel has waived his or her right to self-representation, *see United States v. Martinez,* 883 F.2d 750, 757–58 (9th Cir.1989), *vacated on other grounds,* 928 F.2d 1470 (9th Cir.), *cert. denied,* 501 U.S. 1249, 111 S.Ct. 2886, 115 L.Ed.2d 1052 (1991) (citing state and federal cases reaching this conclusion), or that every defendant who declines to cross-examine a particular witness has made an explicit on-the-record waiver of that right. *Id.* at 758–59. Accordingly, unless there are compelling reasons for conducting an on-the-record colloquy to ensure that a defendant is made aware of, or has waived, a particular right, I see little justification for requiring such a colloquy.

In my view, we must balance the benefits of an on-the-record colloquy with the risks and administrative burden placed on the trial court, keeping in mind the importance of the right at issue, and the necessity of establishing a procedural safeguard to protect the particular right.

An on-the-record colloquy would ensure that a defendant who chooses not to testify has knowingly, intelligently, and voluntarily waived the right to testify. Therefore, even where a defendant's own attorney attempts to prevent a defendant from exercising his or her constitutional right to testify, the defendant would have an opportunity to notify the court of his or her desire to testify. The majority's procedural safeguard, then, appears to be a reasonable requirement to ensure that a defendant has waived his or her constitutional right to testify. Practically speaking, however, it will be a rare case where a defendant is actually unaware of his or her right to testify. Even more remote is the possibility, such as the case at hand, that an attorney will actually deny a defendant his or her right to testify. Therefore, I question the necessity of requiring the trial court to conduct a colloquy to ensure that a defendant has knowingly and intelligently waived the right to testify. Indeed,

> [c]ustom and common sense ... have led to a different conclusion in cases analogous to the instant one. The right not to testify is among the fundamental and personal rights recognized by the Constitution, *see Griffin v. California*, 380 U.S. 609, 614–15, 85 S.Ct. 1229, 1232–33, 14 L.Ed.2d 106 (1965). If anything, one would expect the right not to testify to be more zealously guarded than the right to testify. An uninformed defendant probably expects to testify and may be unaware how strongly the Constitution protects his [or her] right not to testify. Yet the trial court has no duty to make a sua sponte inquiry to advise the defendant of his [or her] right not to testify and to ensure that its waiver was knowing and intelligent. Rather, the defendant by taking the stand waives this significant right even though the record gives no explicit assurance that this waiver was knowing and intelligent. [*United States v.*] *Wagner*, 834 F.2d [1474,] 1483 [ (9th Cir.1987) ].
>
> The court has no obligation to inquire into whether the defendant knowingly and intelligently waived the right not to testify inherent in the privilege against compelled self-incrimination. *Id.* It is primarily the responsibility of counsel, not the judge, to advise a defendant on whether or not to testify, and the tactical advantages and disadvantages of each choice. For the court to discuss the choice with the defendant would intrude into the attorney-client relationship protected by the sixth amendment. *Id., citing United States v. Goodwin*, 770 F.2d 631, 637 (7th Cir.1985).
>
> Every case of which we are aware has reached this same conclusion. *See, e.g., Knowles v. State*, 364 So.2d 712, 713–14 (Ala.Crim.App.1978); *People v. Vargas*, 195 Cal.App.3d 1385, 241 Cal.Rptr. 360 (1987); *People v. Longwith*, 125 Cal. App.3d 400, 178 Cal.Rptr. 136 (1981); *People v. Thomas*, 43 Cal.App.3d 862, 866–68, 118 Cal.Rptr. 226 (1974); *People v. Mozee*, 723 P.2d 117 (Colo.1986); *State v. LoSacco*, 12 Conn.App. 481, 531 A.2d 184, 187 (1987); *State v. McKenzie*, 17 Md.App. 563, 303 A.2d 406 (Md.Spec.App.1973); *Martin v. State*, 73 Md.App. 597, 535 A.2d 951, 952–53 (Md.App.1988) (collecting cases); *People v. Johnson*, 168 Mich.App. 581, 425 N.W.2d 187, 189 (1988); *State v. Bogus*, 223 N.J.Super. 409, 538 A.2d 1278, 1287–88 (1988) (collecting cases); *State v. Poindexter*, 69 N.C.App. 691, 318 S.E.2d 329, *cert. denied*, 312 N.C. 497, 322 S.E.2d 563 (1984).

*Martinez*, 883 F.2d at 756–57.

Given the fact that courts do not even require an on-the-record colloquy to ensure that a defendant is aware of, and has waived, the right not to testify, I fail to understand the necessity of requiring an on-the-record colloquy regarding the right to testify.

The primary impetus for the majority's colloquy requirement is not to protect a de-

fendant's right to testify. Rather, the majority seeks to preclude post-conviction disputes on this issue, and to lessen the difficulty, on appeal, of determining the legitimacy of a claim by a defendant asserting a violation of the right to testify. While I understand the majority's attempt to facilitate more efficient appellate review, the majority downplays the risks and burdens associated with the colloquy requirement regarding the right to testify. A majority of jurisdictions, on various grounds, have recognized the risks and burdens of a colloquy requirement and hold that a court has no duty *sua sponte* to advise a defendant of the right to testify, or to conduct an on-the-record colloquy to ensure that the defendant has knowingly and intelligently waived this right.

> At least seven reasons have been given for this conclusion: First, the right to testify is seen as the kind of right that must be asserted in order to be recognized. Second, it is important that the decision to testify be made at the time of trial and that the failure to testify not be raised as an afterthought after conviction. Third, by advising the defendant of his [or her] right *to* testify, the court could influence the defendant to waive his [or her] right *not to* testify, "thus threatening the exercise of this other, converse, constitutionally explicit and more fragile right." Fourth, a court so advising a defendant might improperly intrude on the attorney-client relation, protected by the Sixth Amendment. Fifth, there is danger that the judge's admonition would introduce error into the trial. Sixth, it is hard to say when the judge should appropriately advise the defendant—the judge does not know the defendant is not testifying until the defense rests, not an opportune moment to conduct a colloquy. Seventh, the judge should not interfere with defense strategy.

*Martinez*, 883 F.2d at 760 (citations omitted) (emphasis in original).

The majority, citing *Kupau* (right to included offense instruction), *Ibuos* (right to trial by jury), *Vares* (right to counsel), and *Conner* (right to have guilt proved beyond a reasonable doubt (i.e., entry of guilty plea)), notes that this jurisdiction already requires trial courts to engage in on-the-record colloquies with criminal defendants when the waiver of other fundamental rights are at issue. Majority at 235–36, 900 P.2d at 1302–03. This fact, however, is of little consequence in light of the vast majority of other rights for which this court does not require an express on-the-record waiver. In addition, I believe that, unlike the other rights for which we require a colloquy, a colloquy requirement concerning the right to testify invites more problems than it solves.

First, the right to testify is a highly tactical decision which a defendant generally reserves while awaiting developments in the trial. On the other hand, the decisions to waive a trial by jury or to proceed without counsel are made before trial. These decisions, then, are more accurately characterized as broad matters of trial strategy rather than tactical decisions made by the defendant, with the advice of counsel, as the trial unfolds.[1] *Commonwealth v. Hennessey*, 23 Mass.App.Ct. 384, 502 N.E.2d 943, *review denied*, 399 Mass. 1102, 504 N.E.2d 1066 (1987). The fact that deciding whether to exercise the right to testify is a highly tactical decision, however, takes on an even greater significance because

> [u]nlike the right to a jury trial and the right to plead not guilty, the right to testify has a mirror image which is constitutionally protected, viz., the right not to testify, to remain silent. When a trial judge intercedes with a colloquy regarding jury trial or the right to plead not guilty, the judge's intentions are clear. He is informing the defendant of constitutionally provided protections. The right to testify

---

1. Although the right to an included offenses instruction is also a tactical decision made by defendant after all the evidence has been presented, the ultimate decision on the jury instructions rests with the trial judge. The trial court's decision is based, in part, on the defendant's under- standing of the waiver of the right to an included offense instruction. As such, the colloquy is an essential factor in the *trial judge's* decision on whether to submit to the jury an included offenses instruction.

is more complex. There is a risk that in explicating the right to testify the judge will cast in unflattering light the right not to testify. To claim the privilege not to testify, the defendant merely remains silent. He [or she] does not have to *claim* anything. Requiring a trial judge to ask the defendant whether he [or she] wishes to testify would carry with it a risk of introducing error if the exchange between judge and defendant appeared to press the merits of taking the stand....

*Id.* at 389–90, 502 N.E.2d at 947 (citations omitted) (emphasis in original). As the majority recognizes, " 'by advising the defendant of his [or her] right to testify, the court could influence the defendant to waive his [or her] right not to testify, thus threatening the exercise of this other, converse, constitutionally explicit and more fragile right.' " Majority at 235, 900 P.2d at 1302 (quoting *Martinez*, 883 F.2d at 760). Nevertheless, the majority is convinced that this risk is minimal and that "with appropriate instructions, the defendant can be advised of both the right to testify and the right not to testify, without influencing the decision one way or the other." Majority at 235, 900 P.2d at 1302 (quoting *Boyd v. United States*, 586 A.2d 670, 679 n. 19 (D.C.App.1991)). I disagree. The facts in *Silva, supra*, provide a classic example of a trial court influencing a defendant's decision to testify. In *Silva*, the trial court, in a colloquy with defendant, dissuaded him from testifying in his own defense:

THE COURT: ....

I believe [Defense Counsel] rested. Now, Mr. Solomon [sic], [Defense Counsel] has seen me in chambers and said that you wanted to testify. Is that correct?

MR. SILVA: Yes, I do, sir.

THE COURT: All right. Let me tell you this: Maybe we should listen to our lawyers, you know what I mean?

The motion that I heard, all the Government has to show me is some evidence of assault and I have to deny the motion.

Now, the Government, on the case on the merits, has the burden of proving each and every element beyond a reasonable doubt which is a much heavier burden. Do you understand that? And I've worked with [Defense Counsel] quite a long time and she's one of the very, very competent Defense Attorney [sic].

Are you telling me you want to go counter to her advice to you?

MR. SILVA: I decided I'll go with her advice, Your Honor.

*Silva*, 78 Hawai'i at 121–22, 890 P.2d at 708–09. The Intermediate Court of Appeals (ICA) held that the trial court violated defendant's constitutional and statutory right to testify in his own defense. *Id.* at 123, 890 P.2d at 710. The ICA further held that once a defendant notifies the court of his or her intent to testify, the court should not comment upon the advisability of such a decision. *Id.* at 124, 890 P.2d at 711. In my view, this precise rule should apply to a defendant who remains silent because "a trial judge may safely assume that a defendant, who is ably represented and who does not testify is merely exercising his [or her] Fifth Amendment privilege against self-incrimination and is abiding by his [or her] counsel's trial strategy; otherwise, the judge would have to conduct a law seminar prior to every criminal trial." *People v. Mosqueda*, 5 Cal.App.3d 540, 545, 85 Cal.Rptr. 346, 349 (1970). Therefore, I agree with the ICA's observation in *Silva* that "[t]he decision to testify is ultimately committed to a defendant's own discretion, preferably in consultation with defense counsel, but neither the *existence nor the nature* of such consultation should ordinarily be the subject of any judicial scrutiny." 78 Hawai'i at 124, 890 P.2d at 711 (emphasis added).

A second problem I foresee with a colloquy regarding the right to testify is the awkward timing involved. The majority requires the trial judge to, whenever possible, conduct the colloquy at the precise moment "immediately prior to the close of defendant's case." Majority at 237, 900 P.2d at 1304. The majority concedes the difficulty presented by this requirement:

Of course, the trial court judge cannot independently foresee when the defense is

on the verge of resting and conduct the colloquy at the precise moment. Consequently, the trial courts will require the cooperation of defense counsel to enable them to conduct the colloquy immediately prior to the close of the defendant's case.

Furthermore, although the ultimate colloquy should be conducted after all evidence other than the defendant's testimony has been received, it would behoove the trial court, prior to the start of trial, to (1) inform the defendant of his or her personal right to testify or not to testify and (2) alert the defendant that, if he or she has not testified by the end of the trial, the court will briefly question him or her to ensure that the decision not to testify is the defendant's own decision. Such an early warning would reduce the possibility that the trial court's colloquy could have any inadvertent effect on either the defendant's right not to testify or the attorney-client relationship.

Majority at 237 n. 9, 900 P.2d at 1304 n. 9.

The majority's solution, however, gives rise to potential problems and ignores the practical realities of courtroom procedure. Relying on the cooperation of defense counsel alone gives rise to the probability of myriad problems that wouldn't otherwise exist. In addition, I question the majority's recommendation that the trial court, prior to the start of trial, alert the defendant that if he or she has not testified by the end of the trial, the trial court will conduct a colloquy to ensure that the decision not to testify is defendant's own decision. If the defendant chooses to exercise his or her right to testify, however, the majority makes no recommendation that the trial court conduct such a colloquy. In my view, this approach is inconsistent and may have the unintended effect of portraying the right not to testify in an unfavorable light. This is because the defendant is informed that the trial court will intervene and conduct a colloquy if defendant exercises the right not to testify, but no colloquy will take place should the defendant chose to exercise his or her right to testify. Because the trial court will inform the defendant, prior to trial, of his or her personal right to testify or not to testify, I believe that the trial court may reasonably construe defendant's silence as an affirmative exercise of the right not to testify, and a colloquy is likewise unnecessary.

The risks and burdens of requiring an on-the-record colloquy regarding the right to testify are significant and substantially outweigh the benefits of a colloquy requirement. A "[d]efendant [is] entitled to make the final personal determination of whether or not to [testify] in consultation with counsel, *without the intervention of the court, whatsoever.*" *Silva*, 78 Hawai'i at 125, 890 P.2d at 712 (emphasis added). In addition, the majority asserts no compelling reasons demonstrating the necessity of such a requirement. Accordingly, I would join the majority of jurisdictions and decline to require the trial court to conduct an on-the-record colloquy regarding the right to testify.